Good morning and may it please the court, Ronald Chapman on behalf of Dr. Parker, I've reserved five minutes for my rebuttal argument this morning. Well, the time will continue to run, so if you wish to reserve, you'll need to stop on your own at the appropriate time. Will do, Your Honor. Thank you. Section 841 targets drug traffickers, not physicians who devote their careers to easing human pain. Yet Dr. Lonnie Parker, a Mayo Clinic-trained physician and certified pain management specialist, was prosecuted and convicted because the jury instructions included a cap on the amount of medication that could be prescribed. The jury instructions included an Arkansas regulation and determined that violation of that regulation is akin to drug trafficking. The Supreme Court, every time it has addressed this issue, has determined that states do control the practice of medicine, but that state regulations cannot be criminalized and that 841 cannot simply be violated as a result of the violation of a regulation. This would create a moving target for physicians where drug trafficking prosecutions could essentially hinge on any regulatory violation that could be shown by the government. Most recently, the court in Ruan v. United States determined that the mens rea must be subjective in a case like this and tied to the specific authorization. In this case, tying the mens rea to the violation of a state regulation essentially created a strict liability offense. And by creating a strict liability offense, it violated the court's specific instructions in Ruan that we must look to the subjective intent of a physician. In Gonzalez v. Oregon, the Supreme Court addressed this and said we need to look to see if the physician is drug trafficking as conventionally understood. The government's case was not based on whether or not the patients needed the medication. The government essentially argued that Dr. Parker gave too much medication. As a result of that, they take issue not with whether or not there was a decision to prescribe to the patient, but how much the patient should receive. Medical disagreements are not drug trafficking. Violation of regulatory standards is not drug trafficking. Drug trafficking is prescribing to a patient where the physician knows that the medication is not for a legitimate medical purpose. Here, because of the specific issue with the instructions, Dr. Parker's conviction should be reversed because the jury should have been instructed that they must find that Dr. Parker specifically knew and intended these prescriptions to be issued for a non-medical purpose. This error was not harmless. In fact, the jury asked a question about this specific standard and returned a conviction after. As a result of that, we can clearly tell, and especially the acquittal on count five, that the jury was carefully looking at the standard and measuring the language. When they asked that question, they were referred back, I believe, to a specific instruction related to this. Now, the government may argue that here there was a knowingly standard in the jury instructions. But the problem with that argument is the knowingly instruction relates back to the violation of a regulatory standard, which means that essentially a physician could be convicted for knowingly violating a regulatory standard. By implication, every single physician who steps outside of Arkansas physician regulations would be considered a drug trafficker and very well could be thrown in jail. The impact to that on the medical profession as a whole and the lack of advancement that would happen in the medical profession would bring very, very alarming consequences and certainly has already caused physicians to not engage in the practice of pain management as a whole. This was so troubling that in 2022, the CDC pushed out guidelines that we've referenced in our brief that specifically warned of the issues associated with criminalizing caps on prescribing of medication. After that, many journals and physician groups pushed out publications that discussed the alarming rate of these prosecutions and why strict prescribing standards are dangerous for pain management. What about the fact that you did not raise this objection to instruction number six? Thank you, Your Honor. I was not trial counsel, but in reviewing the record, and that's why it's a bit muddy at the charge conference, there was some discussion specifically about this instruction. But I believe, importantly, it was raised at Rule 29 and there was also a post-trial motion filed that specifically took issue with this instruction. I don't think a post-trial motion would be adequate to preserve the objection. You seem to be arguing, I mean, you seem to be up against a plain error standard. Even so, under plain error, this would be considered plain error, Your Honor. Other courts have reversed, I believe, I don't have a specific site, but other courts have reversed these instructional issues specifically on plain error. And here, because there was the 2022 CDC guidelines that came out just days after trial, this error was even more highlighted by counsel who immediately filed a motion to address the issue. These instructions were faulty, Your Honor. They changed the outcome of the trial, and it was an error to instruct the jury, under any standard, that it is a crime to violate a regulatory standard. I'd like to move on to the deliberate ignorance issue. Well, how do you think the government is supposed to prove that the physician acted without a legitimate medical purpose and outside the standards of professional practice? This exact question was raised during the Ruan oral argument, as well as in the briefing in Ruan v. United States and the opinion. And what the court said in Ruan is that the government is free to show standards. They're free to show regulatory standards. They're free to bring experts. And when a physician departs so far from the standards, so wildly from the standards, that it can be said that they are not practicing medicine at all, that's when we determine that a conviction should be made. The problem here is that the line was set at the regulatory standard. And what the Ruan opinion specifically says is the government must show a severe departure from that standard through the evidence in the case. Now, we know in this case that Dr. Parker was doing physical exams, ordering imaging, that every single patient here had significant injuries that were being treated by Dr. Parker. There is no evidence here that a single patient walked into a doctor's office and said, I would like a prescription, please, and without any examination received it. I'd like to move on to the deliberate ignorance standard with the few minutes that I have left. This really does relate to the mens rea standard, because deliberate ignorance can only seek to water down what should be a specific mens rea requirement. We rely on global tech in this case to show that the court must identify a fact that indicates wrongfulness. Now, pain management is not such a precise profession, where a potential issue with a patient having addiction or diversion should be considered a fact showing wrongfulness. The reality is, and the literature says, that patients have trouble with medications all the time. Ripping them off of their pain standards. We do not look at red flags of diversion to say that those are facts of wrongfulness that should be included. But in any event, the court in this case did not identify any specific fact that would show that the conduct was wrongful that Dr. Parker specifically ignored. The instruction was simply thrown at the jury without any reference to particular facts indicating wrongfulness. And therefore, the instruction was an error, and it should not have been included. The same issue here with no objection? There was specifically an objection to this instruction, Your Honor. I believe the government's issue is they say that we didn't raise global tech. But what we said was, there wasn't sufficient facts to raise the deliberate ignorance instruction. And in response, the court did not identify any specific facts. And that was specifically discussed at the charge conference, Your Honor. And with just the 50... Well, that's an argument that there was insufficient evidence, you mean, to support the instruction? Yes, insufficient evidence. That's different from challenging how it was phrased in connection with the addiction issue. Our argument is that the court should have pointed to a specific fact, and there were no factual findings. And therefore, no review of evidence to support the instruction as the same. And briefly, with respect to sentencing, the court decided to include, despite there not being a conspiracy charge here, every single drug that was prescribed to these patients was included as a drug that the defendant should be sentenced on, regardless of whether there was a finding that these drugs lacked a legitimate medical purpose. That led to an 87-month sentence that was an error. Just a quick question. When you were talking about the state standard that was being instructed, what exactly was it that was instructed that is troublesome for you? The court instructed the jury that a prescription is issued outside of the course of professional practice, and I'm going to paraphrase, I can't recall the exact quote, if the prescription was issued in violation of appropriate prescribing standards. That was a reference to the CDC guidelines and Arkansas Rule 2, which were the only two prescribing standards that were mandated, those two regulations. And those were admitted into evidence as well. Was it a specific amount, a dosage over a certain amount? Yes. Arkansas Regulation 2 said that 50 morphine milligram equivalents is the dosage cap. Morphine milligram equivalents is the way that they standardized dosing for opiates. Okay. Thank you, Your Honor. Thank you. All right. Mr. Webster, we'll hear from you. May it please the court, my name is John Webster. I'm here today representing the United States of America in this case. After hearing multiple days of testimony and evidence, being given proper instructions by the district court, the jury determined that four of the five prescriptions charged in the second superseding indictment were not written for a legitimate medical purpose in the usual course of medical practice. There is sufficient evidence in the record to support those verdicts. Moreover, at sentencing, the district court correctly concluded that the drugs Parker prescribed to the individuals named in the indictment were part of the same course of conduct and in any event said as part of the sentencing that even if it had ruled differently on Parker's objections, it would have given the same sentence based on the 3553A factors and the facts and circumstances of the case. Now the first thing I would like to address is I believe perhaps a misunderstanding regarding jury instruction number six. Parker's arguing that it tied his conduct to a standard. That is not true. The jury was not simply given Arkansas regulation two and said here you go, see if you violated this. They were given that in addition to the Arkansas Medical Pain Act, the testimony from Dr. Rubenstein, other evidence that they looked at to determine what is the proper standard for practice in the state of Arkansas. Now in his brief, Parker argues that's wrong. We should elect a national standard. The problem with that is there is no national standard. The Supreme Court specifically recognized in Gonzalez that the states fill this area and if Congress wants to, it can if it does so through the statute. It did so with regard to treatment for addiction, but that's not what we're dealing with here. We're dealing with... Counsel, excuse me. Sir. Does that mean that any state's standards could be introduced in this kind of case, Hawaii's or Alaska's? No, I wouldn't say that, Your Honor. I mean, I can see why Arkansas's seem to be relevant because it's in Arkansas, right? Right. But, I mean, there's no, I don't see any tether here between the standard and the statute. Well, I think the statute doesn't necessarily have an explicit, you know, tether in it. The issue is, let's say we had tried Parker and said, okay, according to California, or Hawaii, as Your Honor said, we're going to give the jury this and say, you know, you determine his conduct according to this. Well, Parker's going to turn around and say, I don't know that standard. That's not my standard. You know, it's not his standard any more than, you know, for an attorney, I have to know the standard in Arkansas. It goes to the knowingly part of the offense. Is that what you're saying? Right. I mean, he has to know. But that's what you're saying. That's the tether. That's the tether, Your Honor. Okay. Thank you. And so we, you know, would issue with instruction number six. As Your Honors have noted, you know, he raised a different argument at the jury conference, or the instruction conference, and more than that, he said, you know, aside from our void for vagueness argument, which is not the same as the argument he advances on appeal, we're fine with this instruction other than that. This Court's case law has said that when you agree to a jury instruction, you waive any challenge to that instruction. Here he waived any challenge apart from his void for vagueness argument, which again is different from the argument he's advancing on appeal. Now turning to the deliberate indifference instruction, all Parker argued in his opening brief was the district court failed to identify a fact that, you know, would have constituted wrongdoing. An important point is that's wrongdoing by the patient, not wrongdoing by Mr. Parker. You know, the court is not instructing the jury, if they're doing this, you know, you can find that Dr. Parker's conduct's wrong. The court was saying if you find that, you know, he was deliberately, you know, blinded himself to these facts, you can use that in determining whether he had knowledge. Knowledge of what? Knowledge that he was acting in an unauthorized manner? Yes, sir. It goes to the knowledge element of the offense. Which is knowledge of what? Which is knowledge that these prescriptions were given for other than a legitimate medical purpose and outside the course of recognized medical practice. Well, is there a problem in the instruction saying you may find the defendant acting knowingly if he believed there was a high probability that these three patients were addicted? Because knowledge of addiction, the argument goes, doesn't necessarily mean knowledge of illegitimate purpose in the other point that you made. Right. And I don't think there's a problem there, Your Honor, because again, it's instructing the jury, you know, the knowledge element is one element, right, of the list of elements the jury has to find. And what that instruction is telling the jury is, if you find, he can't say, I didn't know because I didn't look. Know what, though? Know that these prescriptions were not being provided for a legitimate medical purpose. But, all right, so go ahead. If he knew that the people were addicted, then he necessarily knew that the prescriptions were not for a legitimate medical purpose, is that the argument? No, the argument's not that. The argument is that. I'm just wondering if that's where the instruction goes. That I. You may find the defendant acted knowingly if you find that he believed there was a high probability that the three people were addicted. I don't think that that's where the instruction goes, Your Honor, because again. Go ahead, explain it. Because it's tied to the knowledge element. It's saying that if he has, you know, willfully blinded himself to these facts, if you find, you know, those are even applicable, then it goes toward determining his knowledge as to whether or not what he's doing is wrong. Okay, we'll study that. I'm not sure that argument was really raised or where we are with it, but I wanted to ask you about it. Of course. Of course, Your Honor. I mean, the suggestion is not, is it prescribing for an addict is itself necessarily a violation of the standards? No, sir. I don't think that would be true. No, absolutely, that is not true. No, we're at no point saying that if a doctor, you know, sees someone's an addict, they can't treat them. The issue is if you have signs that should tell, you know, a doctor legitimately trying to help a patient that these medications are not being used for that purpose, and he says, nope, I don't see that over there, I'm going to keep prescribing these things to you, even though I have signs in front of me that are telling me you are not using these for a legitimate medical purpose, then he's not. The instruction didn't say that. The instruction didn't say you may find he acted knowingly if he had signs in front of him that the people were not using them for a legitimate purpose. It said if he knew they were addicted. Well, I think, you know, if he knew they were addicted, it goes together with, you know, what did he do once he should have, you know, had or should have had that knowledge. He did nothing. He didn't, you know, address the issue. He ignored the issue and continued prescribing to these people, and, you know, he raised a general denial defense. I didn't, you know, I didn't, you know, none of this was wrongful at all. And so the jury has to find that, you know, he acted knowingly with regard to each element of the offense. And so when you tell the jury that he, you know, he had these signs in front of him and they heard the evidence that, you know, of what he did with these patients, they know that. They're applying that to these instructions. And when you say I have, you know, things that should tell me that these are a problem and I don't do anything about them, my actions in prescribing these medications to these patients are knowingly not for a legitimate medical purpose. Why is addiction a red flag? It's a red flag because you can't treat an addict the same way you treat a non-addict. You can't take an addict and say I'm going to throw more medication at you. There's a difference in how, I mean, just logically a difference in how you have to approach them. And again, we're not saying you have to quit treating a patient once you find out they're an addict. The issue is you can't, you know, have or ignore signs that someone's an addict and treat them just like any other patient. And briefly, I'd like to, you know, touch on sufficiency. Again, the jury heard multiple days of testimony. They heard from Dr. Rubenstein. They heard from Mr. Parker. They heard from Mr. Parker's expert. They looked at all of this evidence and, you know, determined in four of the five prescriptions that he was guilty. And, you know, in his brief, Dr. Parker discusses, you know, differences in prescribing philosophy, but that's not really what this is. If you look at Dr. Rubenstein's testimony, what he's saying is this is not for a legitimate medical purpose and this is why. And the reason why is because there's nothing in the patient files to indicate that it's for a legitimate medical purpose. Further, you know, the assertion that we agreed that all of these patients were being legitimately treated is simply incorrect. I mean, with regard to the, specifically the two gentlemen who received the promethazine cough syrup prescriptions, there's nothing in the medical records to indicate why they needed those prescriptions other than they said, you know, I have a cough and I hurt. And he continues, even after their testing negative, you know, for these substances, indicating they're not actually taking them to prescribe them. It does nothing to address the underlying issues. You know, pain's a symptom. It's not a, it is not, you know, an injury. And he's simply not doing what a doctor should do in addressing, you know, the patient's problem. He's simply throwing drugs at them. And so, you know, the testimony, when you look at it, it's really not differences about prescribing philosophies. It's differences about whether this, you know, is for a legitimate medical purpose and whether it's, you know, in the course of usual medical practice. And here the jury, you know, credited the testimony put on by the government, indicating that, you know, in four of the five cases, they were not. And then finally, with regard to sentencing, the sentencing guideline expressly says, or the comment to 1B1.3, says in distribution cases, you take, you know, you include course of conduct. And here, you know, there's testimony from, you know, Dr. Rubenstein that these medications, not only the ones in the prescriptions, but the other ones that he's charged, because we have multiple prescriptions for the same, you know, drugs. And they're just not medically necessary. So they were properly included. And even if, you know, the court says, well, I don't know that they were, the judge says at the end of the hearing, you know, we, I would have imposed the same sentence based on the 3553A factors that, you know, I am required to consider. So even if you say that, no, the, you know, counting those medications was an error, it's a harmless error because regardless of how it's counted, the court would have imposed the same sentence. And see, I'm nearing the end of my time. Does the court have any further questions? Thank you for your argument. Thank you, sir. I'm going to address a few points that fellow counsel made. First, I think that this issue can be rectified by a very clear standard that requires the jury to look at the purpose of the prescription. Patients can be treated despite having addiction. But the question is, is a doctor treating the patient for a medical purpose or a non-medical purpose? Here, the jury was instructed in a way that would criminalize treatment that was for a medical purpose but was in disagreement with any sort of guideline that was put forward. The specific language of that instruction told the jury to look at two documents specifically. That was Arkansas Rule 2 as well as the CDC guidelines. Now, the strange thing about this case, as I referenced earlier, is that the CDC guidelines were later renewed in 2022 where the dosage caps were removed. Now, Arkansas hadn't gotten around to actually changing it. Counsel filed a post-trial motion arguing that that was new evidence, and that motion was denied. This issue related to the proper prescribing standard being hooked to the CDC guidelines and the Arkansas Rule, which worked together, was preserved by counsel, as well as a significant error that allowed a conviction for violation of a regulation. I'd like to go... Hold on for just a second. Yes, sir. Isn't your concern, though, covered by the fact that they were instructed that it had to be without a legitimate medical purpose and the physician was acting outside the scope of normal professional practice? So this is the conjunctive-disjunctive argument that we raised in our brief. I think that that is an issue that was resolved by the instruction, but the separate issue is what is the mens rea that is tied to that, and what do these things mean? If the mens rea is tied to a specific regulatory standard, then all the physician has to do is knowingly violate Arkansas standards or the very vague CDC guidelines, regardless of the and-or that we put inside of that instruction, and so the error remains. If I may move to deliberate ignorance just briefly. I think that the Court's questions were spot-on with respect to deliberate ignorance. The question for us in reading this instruction is a high probability of what? What did the defendant ignore? The government wanted to avoid saying that they had instructed the jury that a high probability of addiction is enough to determine willful blindness. That's exactly what the instruction appears to say, which means that the jury, in hearing evidence of specifically N.C. being stopped with pills in his car, would have been enough to allow a conviction for Dr. Parker related to this. The reality is, in the facts and in the record, that Dr. Parker took significant steps to identify diversion and abuse and rectify that. Government even admitted that he did urine drug tests. They may dispute that he did nothing after receiving a negative result. Nothing in medical literature says you must refuse to prescribe to a patient because of what one or even two tests say. We look at the patient globally. Judge Arnold had a question.  I thought the Court instructed the jury that one of the facts that he might have blinded himself to was the possibility of his patient's diversion of opioids. Isn't that correct? I don't recall if that was in the specific instruction, Your Honor. I believe the instruction referenced addiction. But there were no specific facts identified in the record that the patients were actually diverting the medication. It does mention addiction. That's why. It does, Your Honor. Yes. I'm not aware of any fact in the record that shows that the patients were actually diverting. In fact, I don't even know that they were diverting. That was not proven in the first instance. And my time is up. Thank you for your time. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted. The Court will file a decision in due course, and counsel are excused.